The STATE of Ohio, Appellant,

v.

ARMSTRONG, Appellee.

[Cite as *State v. Armstrong* (1995), 103 Ohio App.3d 416.]

Court of Appeals of Ohio,
Ninth District, Lorain County.

No. 94CA005992.

Decided May 10, 1995.

*Gregory A. White,* Lorain County Prosecuting Attorney, and *Lisa Locke-Graves,* Assistant Prosecuting Attorney, for appellant.

*James Burge,* for appellee.

REECE, Judge.

Appellant, the state of Ohio, appeals from the trial court's order suppressing evidence of drug trafficking obtained during an investigative stop of the defendant-appellee, Raymond Armstrong. We reverse.

On July 16, 1994, Officers Stevyn Curry and Eric Gonzalez of the Lorain Police Department were patrolling the Leavitt Homes housing project in plain clothes. They were assigned to the department's C.O.P.S. unit, which attempts "to suppress drug activity in the [Leavitt Homes] area because it is notorious for high crime and open drug sales." Around midnight, the officers observed several individuals standing in an unlit area in a "close huddle-style group." The officers moved closer, and they observed "hands moving within [the] tight group." Curry could see the faces of some of the individuals in the group, and he recognized Armstrong as a known drug dealer with prior drug convictions. At this point, the officers suspected a drug sale was in progress. Curry approached the group, identified himself, and separated Armstrong from the group. Curry then conducted a patdown search of Armstrong for weapons.

During the patdown search, Officer Curry felt a large rocky substance in Armstrong's groin. Curry asked, "What is this?" Armstrong responded, "It's my balls. Do you want to see?" Curry stepped back, and a package fell from Armstrong's shorts. Gonzalez picked up the package and performed a field test for narcotics. The substance tested positive for cocaine. The officers arrested Armstrong, and he was charged with one count of aggravated drug trafficking and one count of resisting arrest. Armstrong moved to suppress the cocaine as the product of an illegal search. The trial court granted the motion and the state appeals, claiming in its single assignment of error that "[t]he trial court erred in granting [Armstrong's] motion to suppress when it applied a standard of probable cause."

At the end of the suppression hearing, the trial court stated, "The Court heard the evidence involved here and finds that there was no probable cause. Suppression is hereby granted." The trial court did not indicate whether its finding applied to the investigative stop, the patdown search, or both the stop and the search. Without a specific indication from the trial court, we will review the suppression order as if the trial court found no probable cause for both the stop and the search.

As an appellate court, we must accept the trial court's findings of fact if they are supported by competent, credible evidence from the suppression hearing. *State v. Williams* (1993), 86 Ohio App.3d 37, 41, 619 N.E.2d 1141, 1143–1144. However, after accepting the trial court's findings of fact, we must independently determine as a matter of law whether the trial court applied the appropriate legal standard to those facts and whether the trial court arrived at the proper legal conclusion. *Id.*

Crim.R. 12(E) provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." Even though factual conclusions are often essential to deciding a motion to suppress, they are not always required; so a lower court's ruling on a motion to suppress may turn exclusively upon questions of law. Since rulings on suppression motions "may involve questions of law rather than decisions on factual issues * * * Crim.R. 12(E) does not always require the court to 'state its essential findings on the record' when deciding such a motion." *Solon v. Mallion* (1983), 10 Ohio App.3d 130, 132, 10 OBR 156, 158, 460 N.E.2d 729, 732.

In this case, the trial court did not enter any findings other than its determination that there was no probable cause. As a general rule, a reviewing court presumes the trial court properly followed all procedural mandates. Officer Curry's testimony was the only evidence presented at the suppression hearing. Nothing in the record suggests the trial court did not believe that testimony. Furthermore, nothing in the record suggests the trial court needed to make factual conclusions in order to decide Armstrong's motion to suppress. Cf. *Akron v. Milewski* (1985), 21 Ohio App.3d 140, 141, 21 OBR 149, 150–151, 487 N.E.2d 582, 583–584. In light of the foregoing record, we presume the trial court properly followed the procedural mandate of Crim.R. 12(E) and did not enter any factual findings on the record because it resolved the suppression motion exclusively upon questions of law. Thus, in the absence of an indication to the contrary, we conclude that the trial court found Officer Curry's version of the facts to be true. Accepting those facts as true, we must independently determine as a matter of law whether the trial court applied the appropriate legal standard

to those facts and whether the trial court arrived at the proper legal conclusion. We begin with the investigative stop.

In order to conduct an investigative stop, a law enforcement officer must have a reasonable suspicion, based on specific and articulable facts, that an individual is or has been engaged in criminal activity. *Terry v. Ohio* (1968), 392 U.S. 1, 19–24, 88 S.Ct. 1868, 1879–1881, 20 L.Ed.2d 889, 905–907. As defined in *Terry* and its progeny, a reasonable suspicion is something less than probable cause. *State v. VanScoder* (1994), 92 Ohio App.3d 853, 855, 637 N.E.2d 374, 375–376. The trial court found that there was no probable cause for the investigative stop. Since this is the only statement in the record of the trial court's reasoning, we must conclude that the trial court did not apply the appropriate legal standard. Consequently, we shall review the facts from the suppression hearing under the appropriate legal standard to determine whether Officer Curry had a reasonable suspicion that Armstrong was engaged in criminal activity.

In *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph one of the syllabus, the Ohio Supreme Court stated that "[t]he propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances." The court reiterated this standard in *State v. Andrews* (1991), 57 Ohio St.3d 86, 87–88, 565 N.E.2d 1271, 1272–1274, emphasizing that the surrounding circumstances are to be evaluated "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." In this regard, a reviewing court "must give due weight to the [officer's] experience and training and view the evidence as it would be understood by those in law enforcement." *Id.* at 88, 565 N.E.2d at 1273.

In *Bobo,* the Supreme Court concluded that the totality of the following circumstances supported a finding of reasonable suspicion: the reputation of the area for criminal activity, the officer's experience with drug transactions, the officer's familiarity with the area and how drug transactions occurred there, the officer's perception of the scene, the officer's observation of furtive movements, and the fact that it was night. 37 Ohio St.3d at 179–180, 524 N.E.2d at 491–493. See, also, *State v. Ward* (1992), 80 Ohio App.3d 701, 703, 610 N.E.2d 579, 580; *State v. Victor* (1991), 76 Ohio App.3d 372, 374–375, 601 N.E.2d 648, 649–651.

After reviewing Officer Curry's testimony, we find that the circumstances in this case are strikingly similar to those in *Bobo.* Curry had been trained as a member of the department's C.O.P.S. drug enforcement unit and had experience recognizing drug transaction characteristics. He was familiar with the high-crime nature of the area he was patrolling and how drug transactions occurred there. Around midnight, Curry and his partner observed several individuals standing in an unlit area in a "close huddle-style group," and the officers witnessed "hands moving within [the] tight group." Curry testified that in this

"high drug area," these factors had "led to numerous arrests before by me on similar situations." As Curry moved closer to the group, he recognized Armstrong and knew that Armstrong had prior convictions for drug sales. Viewing the totality of these circumstances as they would be understood by a law enforcement officer trained and experienced in identifying drug transactions, we conclude that Curry had a reasonable suspicion that Armstrong was engaged in drug-related criminal activity.

Despite these specific and articulable facts, Armstrong argues that Curry was acting on an inarticulable hunch. Armstrong points to *State v. Rucker* (1990), 63 Ohio App.3d 762, 580 N.E.2d 59, as authority for the illegality of a stop based on a hunch. In *Rucker,* the defendant was seen placing something into his pocket while walking down the street. No mention was made of any of the *Bobo* factors. In the present case, every *Bobo* factor exists and points to the reasonableness of Curry's decision to investigate a group huddled in the shadows and making furtive movements in an area known for high crime and open drug trade. Moreover, unlike the officer in *Rucker,* Curry and his partner observed more than just the group's furtive movements. As determined by the *Bobo* court, a mere furtive movement, standing alone, does not establish reasonable suspicion to stop a person; however, furtive movements may be considered along with the totality of other circumstances to conclude that an investigative stop was proper. 37 Ohio St.3d at 179–180, 524 N.E.2d at 491–493. In *Bobo,* after considering the officer's experience, his familiarity with the area, and the fact that it was night, the court found that "given the previous factors, such a [furtive] movement may indicate an attempt to conceal a gun or drugs. Also, as noted above, [the officer] had a great deal of experience in making drug arrests, and the gesture made by Bobo was one often made by those engaged in a drug transaction * * *." *Id.* at 179–180, 524 N.E.2d at 492. Because the facts in the present case are analogous to those in *Bobo,* Armstrong's reliance on *Rucker* is misplaced.

Having found that the investigative stop was supported by reasonable suspicion, we turn now to the propriety of the patdown. As with the investigative stop, the trial court did not apply the appropriate legal standard when it held that "there was no probable cause" for the patdown search. Accordingly, we shall apply the correct legal standard to the facts and determine if it was reasonable for Officer Curry to conduct a patdown search of Armstrong during the investigative stop.

Under *Terry,* a law enforcement officer may conduct a limited patdown search for concealed weapons if the officer reasonably believes that "the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others." *Terry,* 392 U.S. at 24, 88 S.Ct. at

1881, 20 L.Ed.2d at 908. Thus, "[w]here a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others." *Bobo*, 37 Ohio St.3d at 177, 524 N.E.2d at 490, paragraph two of the syllabus. Furthermore, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.

In *State v. Evans* (1993), 67 Ohio St.3d 405, 413, 618 N.E.2d 162, 169–170, the Ohio Supreme Court stated that "[t]he right to frisk is virtually automatic when individuals are suspected of committing a crime, like drug trafficking, for which they are likely to be armed." In this case, Officer Curry knew that Armstrong had prior drug sale convictions and he had just observed Armstrong huddled in the dark with a group engaging in conduct commonly associated with a drug transaction. When Curry and his partner approached this group, they entered into a "situation fraught with danger." *Id.* at 412, 618 N.E.2d at 169. In such a situation, "[t]he state's obligation not to violate the individual's Fourth Amendment rights does not command that the police officer forsake reasonable precautionary measures." *Id.* at 410, 618 N.E.2d at 167. Considering that Curry knew that Armstrong was a convicted drug dealer and that the group surrounding Armstrong was acting in a manner consistent with a drug transaction, Curry's patdown search of Armstrong was a reasonable precautionary measure.

Furthermore, Curry observed additional facts that supported the reasonableness of the patdown search. He described Armstrong's body size as "massive" and elaborated that because "Armstrong is a big guy * * * I couldn't assess [whether he was armed] based on a visual look at him." This court recently recognized that a defendant's "large stature" may reasonably heighten an officer's concern for his safety. *State v. Gibson* (Dec. 7, 1994), Summit App. No. 16699, unreported, at 6–7, 1994 WL 686848. Given the dangerous nature of this investigative stop, Armstrong's size and stature heightened the need for Curry and his partner to take reasonable precautionary measures.

Curry also testified that Armstrong appeared nervous and agitated and that, based on his knowledge of Armstrong, this was uncharacteristic behavior for him. Viewing this observation through the eyes of a reasonable and prudent police officer who must react to events as they unfold, Armstrong's uncharacteristic behavior could have reasonably led Officer Curry to suspect that Armstrong posed a danger to the officers' safety. Such a suspicion was reasonable since the officers were in the midst of a possible drug sale, a criminal transaction habitually associated with weapons and violence.

 Having found that the patdown search was lawful, we finally consider whether the officers properly seized the cocaine that fell to the ground from Armstrong's shorts. In conducting a *Terry* patdown search, an officer may remove an object that the officer reasonably believes is a weapon. *Evans,* 67 Ohio St.3d at 415, 618 N.E.2d at 171. Recently, the United States Supreme Court concluded that an officer may also remove an object "whose contour or mass makes its identity [as contraband] immediately apparent." *Minnesota v. Dickerson* (1993), 508 U.S. 366, ——, 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334, 346. See, also, *Evans,* 67 Ohio St.3d at 414, 618 N.E.2d at 170, fn. 5.

 In this case, there is no evidence in the record that Officer Curry removed the cocaine from Armstrong's shorts. Rather, the cocaine fell to the ground after the patdown search had been completed. Under these circumstances, the plain view doctrine is the controlling legal standard.

 An officer's seizure of contraband pursuant to the plain view doctrine will be affirmed if (1) the officer's initial intrusion leading to discovery of the contraband was lawful, (2) the incriminating nature of the contraband was immediately apparent, and (3) the officer had a lawful right of access to the location of the contraband. *Cincinnati v. Langan* (1994), 94 Ohio App.3d 22, 27, 640 N.E.2d 200, 203–204; *State v. Willoughby* (1992), 81 Ohio App.3d 562, 568, 611 N.E.2d 937, 941. We have already determined that the investigative stop and the patdown search were lawful. After the patdown search was completed, but during the ongoing investigative stop, an item fell to the ground from Armstrong's shorts. Officer Curry testified that, based on his experience, the item "appeared to be crack cocaine packaged the way drug dealers package the contraband." At the suppression hearing, defense counsel did not challenge Curry's testimony that he immediately recognized the item as packaged crack cocaine. Defense counsel also did not challenge the officers' lawful right of access to the package once it fell to the ground. From the foregoing record, we conclude that the cocaine was properly seized under the plain view doctrine.

The state's assignment of error is sustained. The trial court's order granting Armstrong's motion to suppress is reversed, and the cause is remanded for further proceedings.

*Judgment reversed*
*and cause remanded.*

SLABY, J., concurs.

BAIRD, P.J., concurs in part.

Baird, Presiding Judge, concurring in part.

Since it appears evident that the trial court applied an erroneous legal standard, I would reverse and remand the cause for application by the trial court of the correct legal standard.