The STATE of Ohio, Appellant,

v.

DELAGRAZA, Appellee.

[Cite as *State v. Delagraza* (2001), 144 Ohio App.3d 474.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 78404.

Decided June 25, 2001.

---

*William D. Mason,* Cuyahoga County Prosecuting Attorney, and *Gail Denise Baker,* Assistant Prosecuting Attorney, for appellant.

*Robert G. Walton,* for appellee.

JAMES D. SWEENEY, Presiding Judge.

Plaintiff-appellant state of Ohio appeals from the trial court's decision to grant the motion to suppress filed by defendant-appellee David L. Delagraza. The appellee was arrested and indicted for possession of crack cocaine, in an amount less than one gram, in violation of R.C. 2925.11.

The state called Cleveland Police Officer Carlos Robles. Officer Robles is an experienced officer who has been with the Cleveland Police Department since 1993. Officer Robles and his partner, Officer George Kwan, are assigned as patrolmen to the Fourth District.

On the evening of October 19, 1999, the officers, while on a routine patrol, were using binoculars to keep the corner of East 102nd Street and Mount Auburn under surveillance. This area is known for drug activity and Officer Robles has made approximately five hundred arrests in this area in the last five years. The officers were down the street in an unlit area; however, Officer Robles testified that they were able to look straight up the street with no obstructions. The area itself is well-lit because there are both street lights and additional lighting from a nearby elementary school.

The officers observed Allen Harris flagging down passing motorists. He was wearing an orange coat and attempting to draw attention to himself by standing in the street and yelling. Based on their experience, the officers believed that Harris was soliciting drug transactions. On three separate occasions, the officers witnessed Harris stop driving motorists. The first time Harris walked up to the car, talked, and then walked away. On the second and third stops, Harris "walked up to the auto, leaned into the auto, talked to the people, did what appeared to be some sort of transaction between himself and the occupants of the auto, then walked away back onto the sidewalk or curb of the street. Then the auto pulled away."

After the third vehicle pulled away, the officer pulled their zone car forward in order to investigate what they believed to be a sale of narcotics. As they were halfway to the corner they observed another automobile, a brown van, pull up near Harris and park at the curb. Harris approached the van and began to speak to the driver. Based on the observations the officers made regarding the behavior of Harris and the prior two vehicles, the officers believed that another drug transaction was occurring.

The officers pulled the police vehicle in front of the brown van, turned on their lights, and ordered the occupants of the vehicle and Harris to raise their hands. Harris complied with the officers' directions, but the men in the van refused. Officer Robles testified that the occupants were "making furtive movements below waist level." When the officers pulled up, the men were "hunched over and put their hands down, started moving them around. Myself and Officer Kwan ordered them at gunpoint to stop moving. They refused. We had to order it 3 more times before both the males in the car raised their hands." When the males in the vehicle failed to comply, the officers drew their weapons. At this point several other zone cars arrived. Based on his experience, Officer Robles believed that the men had either contraband or a weapon and he was in fear for his safety.

On cross-examination, the following exchange occurred:

"Q. And in this case, you say that you saw an individual, who you later determined to be Allen Harris, running down the cars?

"A. That's correct.

"Q. Now, you never actually saw, prior to the arrest in this case, Allen Harris, with any drugs in his hand, did you, sir?

"A. I could never see that, no, sir.

"Q. My question was, you didn't see any drugs in his hand?

"A. No, sir.

"Q. You never saw Allen Harris hand any drugs to any occupants of any cars that he had conversations with, correct, sir?

"A. That's correct.

"Q. And you never saw any occupants of any cars hand Allen Harris any drugs or money, correct, sir?

"A. On that particular evening, no.

"Q. I'm talking about that night, sir.

"A. No.

"Q. And, in fact, as of the time that you determined that you were going to approach Allen Harris, you had seen no drug transactions occur, correct, sir?

"A. I can't be sure of that.

"Q. You had not seen anyone physically exchange drugs or money as of the time you started your car with the intent of pursuing Allen Harris, correct?

"A. No, I did not see drugs or money exchange hands.

"Q. You hadn't seen any weapons visible, correct?

"A. No, I did not."

Officer Robles testified that there was nothing illegal about the manner in which the van was pulled over to the curb. Allen Harris approached the vehicle and spoke to the driver through the window on the driver's side. The officer testified that he did not see Harris hand anything to the appellant and he did not see the appellee hand anything to Harris.

When questioned on cross-examination regarding the furtive movements the officers observed, Officer Robles testified that he could see the heads and upper bodies of the males in the van, but not their hands, waists, or legs. "He hadn't a clue" as to what the men were doing with their hands. Officer Robles further testified that "once their shoulders started moving, I kind of guessed it was a furtive movement." The sole reason the van was approached was based on the behavior of Harris and on the officers' prior police experience.

The court, after closing arguments, made the following statement on the record:

"Well, while I believe that the officers, arguably, had reasonable and articulable suspicion to effect a Terry-type stop regarding Mr. Harris, I believe what we have here is a 'hunch' that does not give rise to the level of the proof of requirement of reasonable and articulable suspicion to satisfy *Terry* [*v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889] or the factors in [*State v.*] *Bobo* [ (1988), 37 Ohio St.3d 177, 524 N.E.2d 489]. I don't believe, by the way, a person has to be a narcotics detective to effect stop. However, in this case, I believe what we had was a 'hunch' that doesn't give rise to that level and therefore I'm going to grant the motion."

The appellant sets forth one assignment of error:

"The trial court erred in suppressing the evidence since the investigative stop was supported by articulable reasonable suspicion that the defendant was engaging in drug trafficking activities."

The appellant argues that the trial court erred in finding that there was not a reasonable and articulable suspicion sufficient to stop the appellee under *Terry*, and *Bobo*, *supra*.

As the Ohio Supreme Court noted in *State v. Orr* (2001), 91 Ohio St.3d 389, 745 N.E.2d 1036, the Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Section 14, Article I of the Ohio Constitution, which contains language nearly identical to its federal counterpart, also prohibits unreasonable searches and seizures. Because Section 14, Article I and the Fourth Amendment contain virtually identical language, they have been interpreted as affording the same protection. See *State v. Robinette* (1997), 80 Ohio St.3d 234, 238, 685 N.E.2d 762, 766–767.

In *State v. Moore* (2000), 90 Ohio St.3d 47, 734 N.E.2d 804, the court held that for a search or seizure to be reasonable under the Fourth Amendment, it must be based upon probable cause and executed pursuant to a warrant. *Id.*, 90 Ohio St.3d at 49, 734 N.E.2d at 806, citing *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585; *State v. Brown* (1992), 63 Ohio St.3d 349, 350, 588 N.E.2d 113, 113–114. This requires a two-step analysis. First, there must be probable cause. If probable cause exists, then a search warrant must be obtained unless an exception to the warrant requirement

applies. If the state fails to satisfy either step, the evidence seized in the unreasonable search must be suppressed. *Id.,* 90 Ohio St.3d at 49, 734 N.E.2d at 806–807, citing *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; *AL Post 763 v. Ohio Liquor Control Comm.* (1998), 82 Ohio St.3d 108, 111, 694 N.E.2d 905.

As the Ohio Supreme Court stated in *Moore, supra,* once a law enforcement officer has probable cause to believe that a vehicle contains contraband, he or she may search a validly stopped motor vehicle based upon the well-established automobile exception to the warrant requirement. *Id.,* 90 Ohio St.3d at 51, 734 N.E.2d at 808, citing *Maryland v. Dyson* (1999), 527 U.S. 465, 466, 119 S.Ct. 2013, 2014, 144 L.Ed.2d 442, 445; *United States v. Ross* (1982), 456 U.S. 798, 804, 102 S.Ct. 2157, 2162, 72 L.Ed.2d 572, 580; *State v. Mills* (1992), 62 Ohio St.3d 357, 582 N.E.2d 972.

At a suppression hearing, as at trial, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact. *State v. Treesh* (2001), 90 Ohio St.3d 460, 739 N.E.2d 749; *Mills, supra,* at 366, 582 N.E.2d at 981–982. As this court held in *State v. Bryson* (2001), 142 Ohio App.3d 397, 755 N.E.2d 964, appellate courts should give great deference to the judgment of the trier of fact. *Ornelas v. United States* (1996), 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911; *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640. Accordingly, we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Klein* (1991), 73 Ohio App.3d 486, 597 N.E.2d 1141; *State v. Armstrong* (1995), 103 Ohio App.3d 416, 659 N.E.2d 844; *State v. Williams* (1993), 86 Ohio App.3d 37, 619 N.E.2d 1141.

In the case *sub judice,* the trial court determined that, as a factual matter, the officer acted on a hunch. The trial court's factual finding is supported in the record by testimony that the officers at no time observed Harris with any drugs, did not see any drugs placed into the hands of any motorists, did not see any motorists hand Harris money, and observed no exchange between Harris and the appellee. Officer Robles testified that he "hadn't a clue" as to what the appellee's hands were doing and "guessed" that the movements of the appellee were furtive. Two additional facts are noteworthy. First, the police officers were patrolmen and were members of neither a vice unit nor narcotics unit. Second, during his testimony, Officer Robles stated that the decision to investigate the activities of Allen Harris had been made prior to the appellant's entry into the area. Giving deference to the trial court's finding of fact, this court must conclude that the trial court did not err in granting the appellee's motion to suppress.

The appellant's assignment of error is overruled.

*Judgment affirmed.*

ANN DYKE, J., concurs.

MICHAEL J. CORRIGAN, J., dissents.

MICHAEL J. CORRIGAN, Judge, dissenting.

The touchstone of any analysis relating to temporary stops under *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, is whether the police had a reasonable suspicion that criminal activity was occurring. See *Illinois v. Wardlow* (2000), 528 U.S. 119, 123, 120 S.Ct. 673, 675–676, 145 L.Ed.2d 570, 575–576. Although this point should be obvious, it bears emphasizing that a reasonable suspicion is not the same thing as proving that a crime actually occurred. The purpose of a *Terry* stop is not to accuse, but to investigate. Even facts that might be given an innocent construction will support the decision to detain an individual momentarily for questioning, so long as one may rationally infer from "the totality of the circumstances—the whole picture," *United States v. Cortez* (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 694–695, 66 L.Ed.2d 621, 628–629, that the person may be involved in criminal activity.

I state these principles of law because the majority opinion misses them completely, instead focusing on law relating to probable cause for searches. The police conducted a *Terry* stop based on a reasonable suspicion that criminal activity may have been taking place. It was during this stop that they discovered the drugs in defendant's car. Once they found the drugs, they had probable cause to arrest. The real issue, then, is what facts gave rise to a reasonable suspicion that criminal activity was taking place.

The arresting officer testified that he had been conducting surveillance in an area known for high drug activity, telling the trial court that he had made an astounding five hundred arrests in that area within the previous five years. The officer said that he saw Allen Harris stand in the street and yell at and flag down three different cars. One of the cars stopped briefly, but continued on. The other two cars stopped and Harris approached them and leaned into them. Although the officer could not say that he saw drugs being exchanged, he did note that Harris's actions were predictably those of one trafficking in drugs.

While I might envision some debate on whether one incident of flagging down and approaching a car is enough to provide a reasonable suspicion that criminal activity is occurring, I find that a third incident in succession is not subject to debate. Harris was clearly not flagging down passing motorists for assistance, nor did the circumstances suggest any other benign purpose for him doing so. Based on their experience, the officers had every reason to suspect that Harris

was dealing drugs. As if this was not enough, the evidence goes further to justify their decision to make a *Terry* stop because Harris stopped a fourth car—that driven by defendant—as they moved in to investigate.

Having cause to temporarily detain Harris as a potential trafficker, the police likewise had reasonable grounds to believe that defendant was a potential buyer. Given Harris's prior conduct, the police could assume that a person stopping his car at night in the middle of a high crime area would possibly be engaging in drug activity. The police did not have to prove this point before making a stop—they merely had to point to all the surrounding circumstances and, using their combined experience, conclude that criminal activity might be occurring.

There is absolutely no significance to the fact that the officer did not actually see either Harris or defendant holding drugs. It is entirely possible that none of the cars stopped by Harris was interested in purchasing drugs. But the real point here is that Harris's attempts to stop and approach cars were suspicious, coming as they did in fairly rapid succession and occurring in an area known for high drug activity. The police could reasonably infer that Harris was not asking for directions.

As the majority opinion notes, the trial court believed that the officers, arguably, had reasonable and articulable suspicion to effect a Terry-type stop regarding Harris. Despite acknowledging the obvious basis for the stop, the court went on to contradict itself by characterizing the stop as being based on nothing more than a "hunch." This confusing statement of law casts considerable doubt on the court's conclusions. Because the totality of the circumstances gave the officers cause to have a reasonable suspicion that criminal activity was occurring, I would find the *Terry* stop valid. I must respectfully dissent from the court's decision to affirm the suppression of evidence seized in this case.