[Cite as *State v. Jackson*, 2022-Ohio-187.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                           :

    Plaintiff-Appellant,          :

                                No. 110462

    v.                                      :

ERIC JACKSON,                            :

    Defendant-Appellee.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 27, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-653761-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brandon A. Piteo, Assistant Prosecuting Attorney, *for appellant.*

Cullen Sweeney, Cuyahoga County Public Defender, and Jonathan Sidney, Assistant Public Defender, *for appellee.*

EMANUELLA D. GROVES, J.:

{¶ 1} Plaintiff-appellant, the state of Ohio ("the state"), appeals from the trial court's April 2021 judgment granting the motion to suppress of defendant-appellee, Eric Jackson ("Jackson"). For the reasons set forth below, we affirm.

**Procedural History and Factual History**

{¶ 2} In December 2020, a grand jury returned a three-count indictment against Jackson, charging him with one count each of having weapons while under disability, carrying a concealed weapon, and improperly handling firearms in a motor vehicle. Each of the three counts contained a forfeiture of a weapon specification. In March 2021, Jackson filed a motion to suppress, which the state opposed. On April 14, 2021, the trial court held a suppression hearing.

{¶ 3} The evidence from the suppression hearing established that the subject incident occurred in October 2020, in the city of Garfield Heights. Garfield Heights Police Officer David Simia ("Officer Simia") was the state's sole witness at the hearing. Officer Simia was wearing a body camera at all relevant times, and the recording from the camera was admitted into evidence. Officer Simia's testimony and the body-camera recording simultaneously demonstrate the following.

{¶ 4} On the night in question, at approximately 8:30 p.m., dispatch for the Garfield Heights Police Department broadcasted that a caller informed dispatch that shots had been fired in the city. Officer Simia was in the area where the shots were reportedly fired and started looking for the suspected vehicle.

{¶ 5} Officer Simia testified that the dispatch described the suspects as two African-American males, "possibly teenagers," one of whom was wearing a gray "hoodie" or jacket, and in a dark-colored sedan, "possibly" an Infiniti. A review of the body-camera recording demonstrates that the vehicle was described as an Infiniti, as opposed to "possibly" an Infiniti, a point Officer Simia conceded on cross-

examination at the suppression hearing. The body-camera recording also demonstrated that dispatch broadcasted that the passenger was wearing a grey Nike jacket.

{¶ 6} Officer Simia testified that other police officers broadcasted that they had seen a vehicle, specifically, "a dark auto," matching the description. A few minutes later, Officer Simia broadcasted that he had seen a "dark-colored Kia" with two black males and the passenger had a gray "hoodie"; the vehicle had passed behind Officer Simia's cruiser.

{¶ 7} At the suppression hearing, Officer Simia testified that the Kia had been missing a front license plate. He also testified that, although it was "hard to tell" how fast the car was being driven, it went "very quickly," "dart[ing]" across an intersection. According to Officer Simia, the driver of the car "seemed in a rush."

{¶ 8} Officer Simia testified that after he had initially seen the Kia, he briefly lost sight of it, but a few minutes later, he saw the vehicle backed into a residential driveway. Only one person, later identified as Jackson, was in the vehicle seated in the driver's seat. The vehicle did not have a front license plate, and Jackson was wearing a white or light gray "hoodie." Officer Simia testified that he was "reasonably certain" the car in the driveway was the same car he had seen a few minutes before.

{¶ 9} The body-camera recording shows that as Officer Simia approached the vehicle, he requested that Jackson put his hands up; Jackson complied. Officer

Simia informed Jackson that there was a shooting in the area, and Jackson responded, "It wasn't me," and told Officer Simia that he lived at the house.

{¶ 10} Officer Simia asked Jackson for identification, to which Jackson reiterated that he lived at the house. Jackson appeared to be annoyed by the request, asking Officer Simia, "Why would I just pull in someone's driveway?" Officer Simia responded, "Can you just not be a pain and cooperate with me?" Jackson said that he had identification and he would get it for the officer. The body-camera recording shows that approximately 45 seconds after Officer Simia approached Jackson, a second police officer had arrived on the scene and was standing by the front passenger door shining a flashlight into Jackson's vehicle.

{¶ 11} By that time, Jackson had his cell phone out and was making a call. As Jackson was getting his identification, Officer Simia asked him if he had something he should not have in the vehicle and asked why he was "freaking out." Jackson responded that he was "freaking out" "because you're pulling up on me in my driveway." The officer told Jackson he "pulled up on him" because his vehicle matched the description of the vehicle from which shots had reportedly been fired.

{¶ 12} Seconds later, Jackson's mother is heard on his cell phone; Jackson asked her to come outside. Jackson then told Officer Simia he could talk to the "people who stay here." Officer Simia told Jackson, "I want to talk to you," to which Jackson responded, "You don't have to talk to me because I'm about to go in the house." Officer Simia told Jackson, "Yes, you do," meaning yes, you do have to talk

to me. The officer asked, "Why are you making this more difficult than it has to be?" Officer Simia then told Jackson that he was being polite to him.

{¶ 13} Jackson then produced his identification, read the address on the identification, and asked the officer, "Can you tell me what that [the address on the garage] says please?" Officer Simia responded, "Why are you being such a smart ass and why are your hands soaking wet?" Jackson responded, "Because I stay here," apparently referring to the officer's question about why he was being a "smart ass." Officer Simia then asked Jackson, "Your hands are soaking wet because you stay here?" Jackson explained, "I'm nervous because you guys pulled up ten deep on me," which was an apparent reference to the number of police officers surrounding Jackson's car. The recording demonstrates that Jackson was annoyed by the intrusion, and Officer Simia told him, "There's no arguing with you if you're going to act like that."

{¶ 14} Seconds later, Officer Simia can be heard relaying to dispatch Jackson's information from his identification, and as Officer Simia is communicating with dispatch, Jackson attempted to put his car key in the ignition; Officer Simia told him, "Stop. Don't put the key in the ignition." By this time, Jackson's mother had come outside, and Jackson attempted to talk with her. Officer Simia told Jackson, "We're just talking to you, relax." Jackson responded that the police were "tripping," and Officer Simia told him that he was "[f]reaking out." Jackson said the police were making him nervous. Officer Simia then told Jackson that he had explained to him what was happening and unless he was having trouble

with his memory, he needed "to just shut up and listen," and that he was "making it way harder than it needs to be."

{¶ 15} Jackson then said, "Okay, you're right. That's my I.D. right there, that's my mom right there." The body-camera recording shows that both Jackson and Officer Simia were agitated — Jackson, ostensibly for the intrusion and Officer Simia, seemingly for Jackson's lack of cooperation. Jackson reiterated that he was just coming home, and Officer Simia responded that he would not have known that unless he asked questions because he was not "f****** Ms. Cleo."[1]

{¶ 16} The encounter simmered down momentarily, with Jackson again explaining that he was coming from his grandmother's house, and Officer Simia explaining that there was a report of shots fired from a dark sedan with a black male wearing a gray "hoodie" and he saw Jackson's car "cross over the boulevard." Officer Simia asked Jackson if he had "anything" in the vehicle, and Jackson responded, "No."

{¶ 17} Officer Simia then saw an open container of alcohol in a cup holder in the driver's door. Officer Simia asked Jackson, "Is that what you're freaking out about?" Jackson reiterated that it was the police presence that had made him nervous. Officer Simia then opened Jackson's driver-side door, which caused Jackson to again get agitated. Officer Simia explained that he had opened the door because Jackson had an open container. At which point, Jackson protested, "But

---

[1] Officer Simia's comment about not being "Ms. Cleo" apparently was a reference to a television personality who was a spokesperson for a telephone psychic service and went by the stage name "Ms. Cleo."

I'm parked in my driveway. You're tripping opening my car door. I'm not doing anything wrong." Officer Simia told Jackson, "I can have you step out of the car for any reason I want."

{¶ 18} Jackson then said he would step out of the car, and Officer Simia told Jackson that his partner would pat him down. Before Jackson stepped out of the car, he again attempted to put the key in the ignition, and the officers told him not to do so. Although Jackson had initially said he would get out of the vehicle, he was reluctant, and the officers ordered him out.

{¶ 19} Jackson's mother, who had been standing outside on the porch, finally asked what was happening. Officer Simia told her, "I just asked him if he'd step out real quick, he's got alcohol in the car, and I'm just trying to talk to him." Officer Simia left the vehicle to go to the porch to talk to Jackson's mother while the other officers on the scene searched Jackson and his vehicle. Officer Simia told Jackson's mother that her son consented to the search.

{¶ 20} While Officer Simia was talking to Jackson's mother, the other officers handcuffed Jackson, and his mother asked why her son was being handcuffed. As he was talking to her, Officer Simia learned that there was a gun in the vehicle; he cited the open container and the gun as the reason for Jackson being handcuffed; he repeated that reason several times during his conversation with the mother.

{¶ 21} When the mother challenged the officers, Officer Simia said the police were not "picking on" Jackson, but he was "freaking out and soaking wet nervous." Jackson's mother stated that she would be nervous too because "nowadays that's all

that's happening, black people being killed by cops." Officer Simia disagreed with her assessment, and when he returned to the vehicle, where the other officers were standing, he complained that the mother branded him as a racist and stated he could not "deal with this anymore."

{¶ 22} After Officer Simia's conversation with Jackson's mother, he learned that marijuana was also found in the vehicle after it was searched. At the suppression hearing, Officer Simia testified that he smelled marijuana shortly after approaching the vehicle. His testimony was vague on when the police discovered the open container, testifying that "at some point" it was discovered. Officer Simia admitted at the suppression hearing that Jackson was neither asked nor consented to the search of his person or vehicle. Officer Simia also admitted that his report did not reference Jackson's alleged intoxication, no field sobriety tests were administered, and Jackson's vehicle was not towed. Jackson was not cited for any traffic violation.

{¶ 23} In his suppression motion, Jackson contended that the evidence in this case was obtained as the result of an unlawful search and seizure, in contravention of the Fourth and Fourteenth Amendment to the United States Constitution and Article I, Section 14, of the Ohio Constitution. Specifically, Jackson maintained that, based on the totality of the circumstances, the police did not possess reasonable, articulable suspicion that he was involved in the reported nearby shooting. Jackson further contended that the automobile exception was

inapplicable because the police searched his vehicle without probable cause that a crime was committed.

**{¶ 24}** Following the hearing, the court issued its judgment granting Jackson's motion. The trial court's judgment reads in its entirety as follows:

> After reviewing the bodycam and the testimony of Officer Simia, the court finds that the officer did not possess sufficient reasonable, articulable suspicion to perform an investigative stop on the Defendant. Therefore, Defendant's Motion to Suppress is granted.

**{¶ 25}** The state now appeals and presents the following sole assignment of error for our review:

## Assignment of Error

> The trial court erred in granting defendant-appellee's motion to suppress.

## Law and Analysis

**{¶ 26}** In the sole assignment of error, the state argues the trial court erred when it granted Jackson's motion to suppress.

**{¶ 27}** This court reviews a trial court's ruling on a motion to suppress under a mixed standard of review.

> "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility." *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). The reviewing court must accept the trial court's findings of fact in ruling on a motion to suppress if the findings are supported by competent, credible evidence. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. With respect to the trial court's conclusion of law, the reviewing court applies a de novo standard of review and decides whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

*State v. Miller,* 8th Dist. Cuyahoga No. 106946, 2018-Ohio-4898, ¶ 22.

{¶ 28} In a suppression hearing, the evaluation of the evidence and the credibility of witnesses are issues for the trier of fact. *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992); *State v. Bryson*, 142 Ohio App.3d 397, 401, 755 N.E.2d 964 (8th Dist.2001). The trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the credibility of witnesses and resolve questions of fact. *State v. Klein*, 73 Ohio App.3d 486, 488, 597 N.E.2d 1141 (4th Dist.1991).

{¶ 29} Therefore, appellate courts should give great deference to the judgment of the trier of fact. *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989). Accordingly, we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *Klein* at *id.*; *State v. Armstrong*, 103 Ohio App.3d 416, 420, 659 N.E.2d 844 (9th Dist.1995). However, the reviewing court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the appropriate legal standard. *State v. Claytor*, 85 Ohio App.3d 623, 627, 620 N.E.2d 906 (4th Dist.1993).

{¶ 30} The Fourth Amendment of the United States Constitution and Article I, Section 14, of the Ohio Constitution guarantee "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." However, these guarantees are not implicated with every police-citizen

contact. *California v. Hodari D.*, 499 U.S. 621, 625-625, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist. 1994). Instead, the individual rights are balanced against the type and extent of the intrusion and the other interests involved, such as crime prevention. *Hodari D.* at 627.

{¶ 31} In balancing these interests, the United States Supreme Court has developed three categories of police-citizen contact. *Florida v. Royer*, 460 U.S. 491, 497-501, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1982). These categories are not intended to be used in a bright-line fashion. As stated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968):

> street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life. Moreover, hostile confrontations are not all of a piece. Some begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element into the conversation. Encounters are initiated by police for a wide variety of purposes, some are wholly unrelated to the desire to prosecute for crime.

*Id.* at 13. Police-citizen encounters are to be judged according to the totality of circumstances. *State v. Williams*, 2d Dist. Montgomery No. 15682, 1996 Ohio App. LEXIS 5896 (Dec. 13, 1996).

{¶ 32} The first category of police-citizen contact is a consensual encounter. The Supreme Court created this category in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). In a consensual encounter, police practices such as approaching a person in a public place, engaging the person in conversation,

requesting information, examining one's identification, and requesting to search a person's belongings are permissible, and Fourth Amendment guarantees are not implicated in such encounters. This category of encounters, like other categories, are judged according to the totality of the circumstances. These encounters remain consensual as long as the police officer, by physical force or show of authority, has not restrained the person's liberty such that a reasonable person would not feel free to walk away. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

{¶ 33} An encounter may also be consensual even when the encounter takes place on private property. *State v. Williams*, 51 Ohio St.3d 58, 61, 554 N.E.2d 108 (1990). For example, it has been held that no Fourth Amendment search occurs when a police officer enters private property and restricts his or her movements to those areas generally made accessible to visitors, such as driveways, walkways, or similar passages. *State v. Lungs*, 2d Dist. Montgomery No. 22704, 2008-Ohio-4928, at ¶ 20, citing *United States v. Reed*, 733 F.2d 492, 501 (8th Cir.1984), and 3 Wayne R. LaFave, *Search and Seizure*, Section 2.3, at 322-323 (1st Ed.1978). "The Fourth Amendment 'protects people, not places,' and '[w]hat a person knowingly exposes to the public, even in his own home or office, is not the subject of Fourth Amendment protection.'" *Lungs* at *id.*, quoting *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

{¶ 34} In *Mendenhall*, the United States Supreme Court listed several factors that indicate that an encounter is no longer consensual and, correspondingly, that

Fourth Amendment guarantees are implicated. These factors include the following: the threatening presence of several officers, the officers' wearing of a uniform, the display of a weapon, the physical touching of the person, the use of language or tone of voice indicating that compliance with the officers' requests are compelled, and the contact occurring in a nonpublic place. *Id.* at 554.

{¶ 35} The second category of a police-citizen encounter is a "*Terry*[2] stop," otherwise known as an investigatory detention. Under a *Terry* stop, a police officer, upon reasonable suspicion, can perform an investigatory detention that is limited in duration and purpose. Reasonable suspicion was vaguely defined as something more than an inchoate or unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause. *Id.* at 27.

{¶ 36} The third and final category of police-citizen contact is the arrest. An individual is found to have been arrested when the following elements are present: (1) there was an intent to arrest; (2) under real or pretended authority; (3) accompanied by an actual or constructive seizure or detention; and (4) that is so understood by the person arrested. *State v. Darrah*, 64 Ohio St.2d 22, 26, 412 N.E.2d 1328 (1980). The Fourth Amendment guarantees are implicated when the above test has been met. Such a seizure is valid under Fourth Amendment standards only if the arresting officer had probable cause to believe that the person committed

---

[2] A "*Terry* stop" was memorialized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

a crime or was about to commit a crime. *State v. Dingess*, 10th Dist. Franklin No. 01AP-1232, 2002-Ohio-2775, ¶ 9.

{¶ 37} As to warrantless search of vehicles, under the automobile exception, police officers may conduct a warrantless search of a lawfully stopped automobile if they have probable cause to believe that the vehicle contains contraband. *United States v. Ross*, 456 U.S. 798, 799, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), citing *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

{¶ 38} We now consider the events in this case based on the above-mentioned jurisprudence.

{¶ 39} In this matter, the state contends that Officer Simia's initial encounter with Jackson was consensual up until the first time Jackson attempted to put his key in the ignition. The state also contends that the officer "first observed the extremely strong odor of marijuana by 'plain smell' when he initially approached the vehicle, barely entering Jackson's property to do so." State's brief, page ten.

{¶ 40} Upon careful review of the body camera, we disagree with both state's contentions. As it relates to the state's contention that the encounter was consensual, we find that the body-camera recording demonstrates that the encounter was neither friendly nor consensual. Rather, Officer Simia authoritatively approached Jackson, ordering him to put his hands up and show his hands. For his part, Jackson was incredulous from the beginning as to why Officer Simia was approaching him and informed the officer that he lived at the home.

{¶ 41} From the outset, when Officer Simia told Jackson that he was investigating a shooting, Jackson immediately denied any involvement in or knowledge of a shooting, telling Officer Simia that he had just arrived home. Officer Simia sensed Jackson's incredulous demeanor, and asked Jackson, "Can you not be a pain and just cooperate with me?" When Officer Simia asked Jackson for his identification, Jackson protested, reiterating that he lived at the home. Officer Simia asked Jackson if he had "something in the vehicle he was not supposed to have" and asked why he was "freaking out." Jackson responded because the police "pulled up on" him in the manner they did.

{¶ 42} Further evidence demonstrates that the encounter was not consensual. Specifically, after Jackson had asked his mother to come out of the house, Jackson told Officer Simia that he could talk to the people who lived in the house, indicating that Jackson did not wish to talk to the police anymore. Importantly, Jackson told Officer Simia as much — telling him he was going in the house. Officer Simia told Jackson he had to talk to him. All of the above mentioned, indicia of lack of consent, occurred prior to Jackson's attempt to put his key in the ignition, which the state now contends was the point when the encounter stopped being consensual.

{¶ 43} Critically, at the point when Jackson first attempted to put the key in the ignition, no contraband had been found. Theoretically, or assuming arguendo, that the encounter was consensual, Jackson would have been free to go prior to that juncture. Again, theoretically, if Officer Simia had smelled marijuana upon

approaching the vehicle, arguably, that would have changed the nature of the encounter at that moment.

{¶ 44} Here, the attendant threatening presence of several officers, along with the show of authority through Officer Simia's tone of voice, clearly indicated to Jackson that compliance was compelled. Under these circumstances, Jackson or another similarly situated individual, would not have believed they were free to walk away.

{¶ 45} We likewise reject the state's second contention regarding the smell of marijuana. As previously mentioned, Officer Simia testified that he immediately smelled marijuana upon approaching Jackson's vehicle. However, the body-camera recording belies that contention as well. Specifically, Officer Simia never told Jackson that the smell of marijuana was emanating from the vehicle. Instead, Officer Simia twice asked Jackson if he had "anything" he should not have had in his possession, and Officer Simia did not tell Jackson that he smelled the odor of marijuana or other illicit substance.

{¶ 46} Further, Officer Simia repeatedly told Jackson's mother that Jackson was being arrested for the open container and the gun never mentioning anything about the smell of marijuana. On this evidence, we are not persuaded by the state's contention that the smell of marijuana justified the continued detention. As a result, we find that the encounter was not consensual.

{¶ 47} Having found that the encounter between Jackson and the police was not consensual, we now consider whether the encounter was a permissible *Terry* investigative detention.

{¶ 48} Regarding the initial encounter, based on the investigation of shots fired, Officer Simia testified at the hearing that he had approached Jackson's vehicle because the "vehicle and the driver matched the description that we were provided." As previously noted, the trial court disagreed, finding that Officer Simia "did not possess sufficient reasonable, articulable suspicion to perform an investigative stop." Upon our de novo review, we find that the trial court's conclusion meets the appropriate legal standard.

{¶ 49} At this juncture, it is worth restating that reasonable suspicion is something more than an inchoate or unparticularized suspicion or "hunch." *Terry*, 392 U.S. 1, at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889. The documentary evidence in this case contradicts Officer Simia's contention that Jackson matched the described suspect and that his vehicle matched the suspect vehicle.

{¶ 50} In this matter, the dispatch broadcast was that the vehicle was a black Infiniti. However, Jackson's vehicle was a Kia. Judicial notice is taken that the Infiniti and the Kia are vehicles of completely different ilk. The dispatch broadcast also stated that there were two individuals in the vehicle, "possibly teenagers," and the passenger was wearing a grey Nike jacket. When Officer Simia approached Jackson sitting behind the wheel of a Kia, Jackson was alone in the vehicle, and

sitting in the driver's seat.  Jackson was wearing a Polo-brand "hoodie," not the Nike branded "hoodie" relayed in the broadcast.

{¶ 51} In addition, it is without question that Jackson did not match the "possible teenager" description relayed by dispatch.  Jackson told Officer Simia and subsequently provided identification that he was 30 years old.  Indeed, Jackson does not present as a teenager in the body-camera recording. Further, Officer Simia's apparent reliance on the fact that Jackson's vehicle was missing a front license plate as justification for the stop was also misplaced.  Our review of the body-camera recording reveals that the dispatch broadcast never provided information relative to missing front license plate in its description of the vehicle.  Of note, in April 2020, lawmakers passed H.B. 62 requiring only one license plate to be displayed on motor vehicles including passenger vehicles.   Since July 1, 2020, a front license plate is no longer required in Ohio. Thus, even if dispatch had broadcasted information about a missing license plate, that would not have been a justification for a stop that took place in October 2020.

{¶ 52} With respect to Jackson being "nervous and sweaty," the trial court addressed that observation, finding Jackson's on-scene explanation credible. Specifically, the court noted that Jackson's nervousness and sweatiness were not legitimate reasons for his detention, because "Black men are killed a lot for doing nothing but sitting in a car."  Here, we are reminded that the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the credibility of

witnesses and resolve questions of fact. *Klein*, 73 Ohio App.3d at 488, 597 N.E.2d 1141.

{¶ 53} Finally, even if we were to find that the police had reasonable suspicion for the initial encounter, we find the prolonged detention of Jackson problematic. The state contends that the open container of alcohol justified the continued detention. But the record demonstrates that the alcohol was discovered after the point at which the state concedes Jackson was seized, specifically, after he first attempted to put the key in the ignition.

{¶ 54} Moreover, the state's contention that the gun was found in "plain view," is not borne out by the record. Rather, the record demonstrates that the gun was found after Jackson was removed from the vehicle and the vehicle searched. Regarding the search of the vehicle, because we find the initial detention (or the continued detention of Jackson) was not lawful, the automobile exception to the general rule against warrantless searches was not applicable here.

{¶ 55} In light of the foregoing, we agree with the trial court's finding that Officer Simia "did not possess sufficient reasonable, articulable suspicion to perform an investigative stop." Decisively, nothing in the record indicates that the police encounter with Jackson was consensual. Further, the investigative detention of Jackson was not supported by a reasonable, articulable suspicion. Neither did the automobile exception to the general prohibition against warrantless searches apply in this case. As such, the trial court properly granted Jackson's motion to suppress.

{¶ 56} Accordingly, we overrule the state's sole assignment of error.

{¶ 57} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

EMANUELLA D. GROVES, JUDGE

MARY EILEEN KILBANE, P.J., and
LISA B. FORBES, J., CONCUR