**UNITED STATES of America,**
**Plaintiff,**

v.

**Wayne Clive BRIDGEWATER,**
**Defendant.**

**No. 00–315 (DRD).**

United States District Court,
D. Puerto Rico.

Nov. 16, 2001.

Epifano Morales-Cruz, Federal Public Defenders Office, San Juan, PR, for Defendant.

Matthew H. Thomas, U.S. Atty's Office, Criminal Div., San Juan, PR, for Plaintiff.

## *ORDER*

DOMINGUEZ, District Judge.

Pending before the Court is a renewed Motion to Dismiss the Indictment, filed by Wayne Clive Bridgewater ("Defendant"). (Docket No. 57). Defendant initially filed the Motion to Dismiss the Indictment on January 15, 2001. (Docket No. 28). The Court referred the motion to the U.S. Magistrate Judge Justo Areñas for a Report and Recommendation. The Magistrate filed his corresponding Report and Recommendation ("MRR") on February 27, 2001, recommending that the Motion to Dismiss be denied. (Docket No. 33). Defendant filed his Objection to Magistrate's Report and Recommendation on April 19, 2001, disputing the contentions that the arrest was performed in international waters and that authorities of the Government of St. Kitts and Nevis aided in the arrest. (Docket No. 43). Following the ensuing evidentiary hearings, Defendant filed a Supplemental Memorandum of Law in support of Motion to Dismiss. (Docket No. 57).[1] The United States faxed to the Court and to Defendant a Reply on October 11, 2001. (Docket No. 59). After careful consideration, the Court finds that Defendant's allegations do not support the relief requested.

---

1. The Court held three hearings. An Argumentative hearing was held on May 21, 2001 and two Evidentiary Hearings were held on June 27, 2001 and July 10, 2001.

# I

## FACTUAL BACKGROUND

The facts are presented essentially as recited by Special Agent James Agee ("Agent Agee") of the Drug Enforcement Administration ("DEA"). (Docket No. 50). There are facts that are in dispute which are discussed in the opinion. DEA agents planned a ruse in St. Kitts, with the pretense of arresting Mr. Wayne Clive Bridgewater ("Defendant") and Mr. Kendrick Simmonds. The mechanics of the operation were to lure both men to a chartered vessel to seek payment of drugs previously delivered on land. The drugs were to be delivered, on land, to a DEA informant in Frigate Bay, St. Kitts. Upon delivery of the drugs, the men would have to board the vessel in order to receive payment. Once on the vessel, the captain was instructed to move to international waters, where the arrest could ensue. The United States Coast Guard was on notice to make a "routine stop" and take everyone into custody, once the vessel entered international waters. The ruse was planned in this manner in order to protect the identity of the confidential informant.

The team assembled to execute the ruse included Agent Agee, three (3) other DEA agents and the informant. Also, aboard the vessel were the captain and one crew member. The DEA agents chartered a thirty-five (35) foot sport fisherman, in Antigua, under the pretense of being tourists on a day trip to St. Kitts. It was not until the vessel cleared customs in Nevis that the captain of the boat and the crew captain were informed, by the agents, of the drug operation. The captain, nevertheless, agreed to go forward with plan.

On the date of the ruse, June 2, 2000, once the boat reached Frigate Bay in St. Kitt's, the informant made several phone calls. The informant then went ashore and left in Mr. Simmonds' car. The informant later returned with Defendant Bridgewater, in the same vehicle. Mr. Simmonds did not participate in the transaction because by the time the DEA vessel arrived in Frigate Bay it was time for him to report to work. Upon the return of the informant with Defendant, the agents could see from the boat that they had parked in the nearby bar parking lot. It was in this parking lot that the drug exchange took place. Defendant handed the informant a cardboard box containing five (5) kilos of white powder, allegedly cocaine, and a small package containing a sample.[2] During the exchange, the informant noticed that Defendant was carrying a weapon. The informant coaxed the gun from Defendant by assuring him that they were dealing with businessmen, therefore, there was no need for a weapon. The informant proceeded to place the gun in the box containing the drugs and to board the DEA vessel, carrying the box. The informant reboarded the vessel in a jetty. Defendant also boarded the vessel, in order to receive payment.[3] When he boarded the vessel, Defendant was wearing loose clothing that could have concealed another weapon. As soon as Defendant was on board the vessel, the captain followed his instructions and headed at high speed to international waters.

**2.** Subsequent tests proved that the five (5) kilos were actually flour. However, there was 2.7 grams of cocaine in a small package, also within the box.

**3.** The ruse and the ensuing exchange of drugs took place on June 2, 2000. However, DEA

Agent Stonewall, also a participant in the ruse as an undercover agent, had previously paid Defendant Bridgewater a good faith down payment of eight thousand dollars ($8,000), on April 19, 2000. (Docket No. 13).

When he reboarded the vessel, the informant presented the undercover agent with the box and its contents. However, five kilos was only half of the amount of cocaine that had been requested. Soon after a heated discussion ensued between the undercover agent and Defendant, regarding the other five kilos. Defendant became extremely agitated and angry and began asking for his money. The change in Defendant's demeanor precipitated Agent Agee's decision to place him under arrest. When Defendant was placed under arrest, he had been on the DEA vessel anywhere from fifteen (15) to thirty (30) minutes. Meanwhile, the boat had been traveling at a high speed, from ten (10) to fifteen (15) knots. Furthermore, when the DEA vessel was able to contact the U.S. Coast Guard Cutter, the cutter marked them as being nineteen (19) nautical miles away. At that point the cutter was off the coast of Nevis and was tracking the DEA vessel by means of pings from a beacon. The beacon aboard the DEA vessel was used as a homing device.

Because the Coast Guard was nineteen (19) nautical miles away, the DEA vessel decided they would be unable to rendezvous with the cutter and therefore proceeded directly to Antigua. This determination was also prompted by the poor weather conditions and the fact the boat had no running lights. During the voyage to Antigua, Defendant remained in handcuffs, down below in the berth, surrounded by DEA agents. Throughout the journey back to Antigua, Defendant was well-treated; he was given slacks, a shirt, slippers and water. Defendant's only complaints about his treatment were that the handcuffs were too tight, that the agents didn't replace the plastic bag he was vomiting into and that the agents were slow in bringing him water. However, Defendant agrees that his uncomfortable conditions were primarily due to the then current extreme weather conditions. In addition, as soon as the vessel reached Antigua an agent procured a handcuff key from the Antiguan police and loosened the handcuffs. When they arrived in Antigua, it was impossible to transport Defendant to Puerto Rico, therefore, he was lodged in an Antiguan jail for the night. The following morning, a DEA plane transported Defendant to San Juan, Puerto Rico.

## II

## ANALYSIS

### A. MANSFIELD AMENDMENT

Defendant first contends that his abduction/arrest was in violation of the Mansfield Amendment, 22 U.S.C. § 2291(c)(1). The Mansfield Amendment, states that "no officer or employee of the United States may engage or participate in any direct police arrest action in any foreign country with respect to narcotic controlled activity." 22 U.S.C. § 2291(c)(1).

The Court recognizes that, pursuant to the facts explained by Agent Agee, the question of whether there was "direct police action in any foreign country" here is close. International waters begin at twelve nautical (12) miles out from shore. (Docket No. 28). Nevertheless, the Government has stated that the boat was traveling between 10 to 15 knots during a period of approximately 15 to 30 minutes. (Docket No. 50). Furthermore, the Government supplements this evidence with the statement that, when the Coast Guard was monitoring the DEA vessel, the first ping the agents heard indicated that the DEA vessel was nineteen (19) miles away from the Coast Guard cutter. (Docket No. 30). This beacon emitting the pings was used as a homing device. (Docket No. 50). The ping suggests that the DEA vessel was in international waters because the

cutter was already traveling off the coast of Nevis when it received the ping. (Docket No. 30).

The Court need not make a factual determination as to the controversial fact at this stage. Even if the arrest was performed within the territorial waters of St. Kitts, the arrest may still have been permissible. The Mansfield Amendment provides an exception, whereby, under "exigent, threatening circumstances" agents may act "to protect life or safety." 22 U.S.C.A. § 2291(c)(3). Whether or not the circumstances of that evening warranted an arrest in order to control the situation is also a close question. Before Mr. Bridgewater even boarded the vessel he had already handed over a Byrco 9mm semi-automatic handgun to the DEA's informant. (See Dockets Nos. 30 & 50). Furthermore, Defendant was becoming increasingly agitated and angry as the DEA vessel moved out to sea; he repeatedly began demanding the money. (Docket No. 50). The approaching nightfall and the worsening of the weather contributed to the potentially volatile situation. *Id.* Additionally, Defendant was wearing loose clothing facilitating another concealed weapon. *Id.* Therefore, this combination of Defendant's agitated demeanor, the probability of another weapon, and an inability to control the forces of nature may have created exigent and threatening circumstances for not only to the DEA agents safety but also to the two civilians on board.

 Nonetheless, the Court does not have to address whether or not the arrest was in international waters or whether or not there were "exigent circumstances" because District Courts shall retain jurisdiction even if the defendant is brought into the jurisdiction against his will. *United States v. Alvarez–Machain,* 504 U.S. 655, 661, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). "This Court has never departed from the rule that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'" *Alvarez–Machain,* 504 U.S. at 661, 112 S.Ct. 2188, citing *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *see also Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). "There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." *Frisbie,* supra, at 522, 72 S.Ct. 509. Furthermore, the Mansfield Amendment is not self-executing, wherefore, there are no sanctions for violations. 22 U.S.C.A. § 2291. The Mansfield Amendment regulates government action prescriptively; it does not provide repercussions for violations of the Amendment. *United States v. Zabaneh,* 837 F.2d 1249, 1261 (5th Cir.1988). A dismissal of the indictment is an unwarranted remedy under the Mansfield Amendment. "... Congress has not provided sanctions or penalties by way of relief for persons arrested in contravention of [The Mansfield Amendment] § 2291(c)(1)." *Id.* Furthermore, the facts of this case as to the arrest of Defendant do not rise to "outrageous" or "shocking to the conscience" as to constitute a violation of due process rights, under the Fifth Amendment. *Frisbie,* 342 U.S. at 521, 72 S.Ct. 509.

**B. UNITED STATES–ST. KITTS & NEVIS MARITIME COUNTER–DRUG OPERATIONS AGREEMENT OF APRIL 13, 1995.**

 Second, Defendant claims that the DEA ruse is to be considered a counter-drug operation in the waters off St. Kitts and Nevis and executed without the permission of the Government of St. Kitts

and Nevis. Therefore, the DEA's activities were in violation of the United States–St. Kitts Maritime Counter–Drug Operations Agreement ("Agreement").[4] Again the question of where **the arrest** occurred is close, and the Court does not deem necessary to make a finding at this stage of the proceedings. However, the Court finds that the exchange of drugs clearly took place on land as well as the initial payment of the money advanced to Defendant as a good faith initial payment. (Sealed Transcript, Docket No. 50A, pp. 73–80). Therefore, the transaction cannot be considered a maritime counter-drug operation and thus, the Agreement was not violated. The DEA's informant boarded the vessel with the five (5) kilos of cocaine, provided by Defendant Bridgewater on land. (Docket No. 50, pg. 58). Furthermore, the arrest did not violate the Agreement because the St. Kitts police knew about and cooperated with the ruse.[5]

## C. INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS

■ Defendant's third argument, seeking the protection of the International Covenant on Civil and Political Rights ("ICCPR"), is also easily dismissed.[6] The protection of Article 9 of the ICCPR is unavailable because the ICCPR is not self-executing, through express acknowledgment by Congress. The Senate's consent to the ICCPR was subject to the declaration that "the United States declares that the provisions of Articles 1 through 27 of

the Covenant are not self-executing," 138 Cong.Rec. S4781, S4784. Since the ICCPR is not self-executing, it does not give rise to privately enforceable rights under United States law. *Igartua De La Rosa v. United States*, 32 F.3d 8, 10 n. 1 (1st Cir.1994), *cert. denied*, 514 U.S. 1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995). Defendant may not rely upon the provisions of the ICCPR in the courts of the United States. *Id.* Defendant is thus seeking a remedy from a source which cannot provide relief.

## D. SUPERVISORY POWER

■ Defendant's final argument rests on the allegation that the Court should exercise its Supervisory Power and grant a dismissal of the indictment in order to preserve "judicial integrity" and "deter illegal conduct." The Court rejects this argument for the reason that no illegal activity, on the part of the DEA, can be discerned from the record. Moreover, provided arguendo that such activity might have occurred, the record is deficient of any evidence showing an deliberate violation of law.[7] Defendant draws the attention of the Court to *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1945). Unlike the present case, in that case the defendants were held and questioned for extensive periods of time, rising to an egregious level of police misconduct. In the present instance, Defendant himself admitted that

4. Agreement between the United States of America and the Government of St. Kitts and Nevis concerning Maritime Counter–Drug Operations of April 13, 1995, entered into force June 27, 1996, State Dept. No. 95–106, KAV 4231, as amended on June 27, 1996, State Dept. No. 96–130, KAV No. 4690.

5. The Government has presented evidence, under sealed record, supporting their contention that the St. Kitts police consented, coop-

erated and participated in the ruse. (Sealed Transcript, Docket No. 50A, pp. 73–80).

6. International Covenant on Civil and Political Rights, Dec. 16, 1996, 999 U.N.T.S. 171, 6 I.L.M. 368 (1967) (entered into force Mar. 23, 1967).

7. The original plan unquestionably called for an arrest by the United States Coast Guard in international waters.

he had very few complaints about his treatment by the DEA agents. (Docket No. 50). He attributes his lack of comfort mostly to the weather conditions. (Docket No. 50, pg. 29). Furthermore, Defendant concedes that the agents were not paying him much attention. (Docket No. 50, pg. 30). Defendant's only instances of ill treatment are handcuffs that were too tight, slow drinking water service and refusal to change the plastic bag in which he was vomiting. *Id.* Additionally, he admits that the agents were also having trouble with the rough weather and were also seasick. (Docket No. 50, pg. 26). Therefore, the *McNabb* holding is inapplicable to the case at hand. The Court holds that the DEA agents' treatment of Defendant did not rise to the level of "egregious police misconduct," and therefore, declines to exercise Supervisory Power.

### III

### CONCLUSION

In conclusion, Defendant seeks a remedy of dismissal of the indictment which is unavailable under the Mansfield Amendment, the United States–St. Kitts and Nevis Maritime Counter–Drug Operations Agreement and the International Covenant on Civil and Political Rights. None of these international agreements are self-executing, therefore, they do not provide for the requested remedy of the dismissal of the indictment. Lastly, it is within the Court's discretion to invoke its Supervisory power, and the Court does not find it appropriate to exercise its discretion in the present case. For the aforementioned reasons, Defendant's Motion for Dismissal of the Indictment is **DENIED.**

After reviewing this matter in a de novo fashion, including revisiting the evidence anew, the Court denies Defendant's Motion for Dismissal of the Indictment. The Court, therefore, Denies the Dismissal requests (Docket Nos. 28 & 57) and affirms the Report and Recommendation by Honorable Magistrate Judge Justo Arenas of February 27, 2001 (Docket No. 33).

**IT IS SO ORDERED.**