[Cite as *State v. Hicks*, 2023-Ohio-4126.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO, :

    Plaintiff-Appellant, :

                                No. 112513

v. :

WILLIE HICKS, :

    Defendant-Appellee. :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** November 16, 2023

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-672509-A

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Frank Romeo Zeleznikar and Andrew Boyko, Assistant Prosecuting Attorneys, *for appellant.*

Christopher McNeal, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Jonathan Sidney, Assistant Public Defender, *amicus curiae.*

FRANK DANIEL CELEBREZZE, III, P.J.:

{¶ 1} Appellant, the state of Ohio ("the state"), appeals from the trial court's judgment granting the motion to dismiss filed by defendant-appellee, Willie Hicks

("Hicks"). After careful review of the record and relevant case law, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

## I. Procedural and Factual History

{¶ 2} On October 3, 2021, members of the Garfield Heights Police Department responded to an apartment complex located in Garfield Heights, Ohio, at approximately 3:17 a.m. after receiving multiple reports of "shots fired." (Tr. 14, 70). The person that placed the 911 call stated that the "shots were continuous and not stopping." (Tr. 82.) The responding officers were not provided with any information regarding a description of the potential suspects or whether a vehicle was linked to the shooting. (Tr. 113.)

{¶ 3} Upon arrival, Patrolman Peter Stockhausen ("Ofc. Stockhausen") attempted to speak with bystanders in an effort to gauge their involvement in the reported shooting, or, alternatively, determine whether they witnessed the shooting or were injured. Ultimately, Ofc. Stockhausen was unable to gather pertinent information from the individuals he initially approached in the parking lot.

{¶ 4} Thereafter, Ofc. Stockhausen observed an individual, later identified as Hicks, attempting to exit the parking lot of the apartment complex in a red Dodge Challenger. Ofc. Stockhausen used his flashlight to signal for Hicks to stop the vehicle. He then asked Hicks to "turn the car off." (Tr. 20.) Hicks complied with Ofc. Stockhausen's initial request to stop the vehicle. Hicks, however, refused to

turn the car engine off and "said something to the effect that he wasn't involved" in the incident that the police were investigating at the apartment complex. (Tr. 26.)

{¶ 5} Unsatisfied with Hicks's response, Ofc. Stockhausen "pulled" on the door handle of Hicks's driver's side door to forcibly remove Hicks from the vehicle "because he wasn't immediately getting out of the car as [Ofc. Stockhausen] asked him to." (Tr. 20.) Hicks immediately accelerated his vehicle and attempted to flee the parking lot by crashing into a police cruiser, which was blocking the exit. Before Hicks could exit the parking lot, however, Patrolman Ronald Dodge ("Ofc. Dodge") of the Garfield Heights Police Department, fired his service weapon 12 times into the front driver's side of Hicks's vehicle. Ofc. Dodge later described the circumstances supporting his decision to fire his service weapon as follows:

> Several commands were being given that you can't hear on my body camera for him to stop, exit the car, show his hands. And then at one point I backed up and I yelled at him a couple times, realized that he can't hear me or figured he couldn't hear me. And then he looked up — looked right at me and then he gunned the vehicle at me.
>
> * * *
>
> When I was running over, over the radio I heard — I heard more officers call out that they were arriving on scene so I knew they were coming up from behind and they couldn't have known what was going on at this point you know how it was going to unfold. So they're in the path of this vehicle and the driver and then he crashed so * * * I was worried he was going to smash into them. He was going to hit them. They weren't going to see it coming.

(Tr. 86-87.)

{¶ 6} Ofc. Stockhausen did not fire his service weapon, but acknowledged that he had warned Hicks that he would shoot

[b]ecause [Hicks] was driving his car towards [Ofc.] Dodge and I knew that officers were responding and that they would be there fairly shortly so I suspected at the time that if he was to leave from that area there's a highly likely chance that he would hit another officer that was responding as well, not to mention possibly other pedestrians that might have been walking around as well.

(Tr. 29-30.)

{¶ 7} Hicks was shot eight times in his torso and upper extremities. He lost control of his vehicle and crashed into a nearby building. After the vehicle crashed, Hicks crawled from the vehicle, wounded. Emergency medical treatment was administered on the scene, after which Hicks was placed under arrest and was transported to a hospital for further care. Officers later discovered a firearm on the floorboard of the Dodge Challenger and learned that the vehicle driven by Hicks had been stolen. Video footage of the incident was captured by the body cameras worn by Ofcs. Stockhausen and Dodge.

{¶ 8} Hicks survived his injuries, and on July 21, 2022, he was named in a five-count indictment. Count 1 charged Hicks with felonious assault in violation of R.C. 2903.11(A)(2), with a furthermore specification that the victim was a peace officer. As described in the indictment, Hicks was charged with attempting to harm Ofc. Dodge with a motor vehicle. Count 2 charged Hicks with receiving stolen property in violation of R.C. 2913.51(A) and pertained to the 2020 Dodge Challenger that Hicks was operating at the time of the incident. Count 3 charged Hicks with vandalism in violation of R.C. 2909.05(B)(2), with a furthermore specification that the value of the property or the amount of physical harm involved is $7,500 or more

but less than $150,000. As described in the indictment, Hicks caused harm to property that was owned, leased, or controlled by a governmental entity: the police cruiser that he drove into while attempting to flee. Count 4 charged Hicks with criminal damaging or endangering in violation of R.C. 2909.06(A)(1), with a furthermore specification that the offense created a risk of physical harm to another and described that the damage was to a 2016 Ford Flex, located in the parking lot of the incident. Count 5 charged Hicks with improperly handling a firearm in a motor vehicle in violation of R.C. 2923.16(B), with a forfeiture specification.

{¶ 9} On November 7, 2022, Hicks filed a motion to suppress evidence of his conduct following the initial stop, arguing that Ofc. Stockhausen's conduct amounted to an unlawful seizure that was made without probable cause to believe that Hicks had committed a crime or witnessed a crime being committed. Hicks further argued that Ofc. Dodge's use of deadly force was unlawful and objectively unreasonable. Finally, Hicks sought to dismiss his criminal case "due to outrageous government misconduct." In support of this position, Hicks stated that Ofc. Dodge's conduct was so egregious that it violated principles of fairness and shocked the universal sense of justice such that the government should be barred from invoking judicial process to obtain a conviction.

{¶ 10} The state opposed Hicks's motion to dismiss, arguing that the responding officers had probable cause to stop Hicks's vehicle for investigative purposes because he was observed leaving the area where shots were reportedly fired. The state further claimed that even if the initial stop and detention of Hicks

was unlawful, the exclusionary rule would not apply to exclude evidence of Hicks's independent criminal conduct. Lastly, the state asserted that the officer's use of force was reasonable under the circumstances and that a claim of "outrageous government conduct" is not a legally viable way to dismiss a criminal indictment.

{¶ 11} On March 3, 2023, the trial court held a hearing to address Hicks's motions. On March 9, 2023, the trial court issued a judgment entry granting Hicks's motion to suppress and dismissing his case with prejudice. The entry pertinently provides:

> Court finds the initial stop of the defendant's vehicle coupled with the attempt to open the door of the defendant was a seizure lacking probable cause and violation of the [Fourth] Amendment; Motion to suppress is well taken and granted. Court further finds that the Garfield Heights Police Department created the situation that led to the subsequent events; Motion to dismiss is well taken and granted.

{¶ 12} The trial court's judgment did not assess whether Ofc. Stockhausen possessed a reasonable, articulable suspicion of criminal activity to conduct an investigatory stop, nor did the trial court's judgment address the reasonableness of Ofc. Dodge's use of force.

{¶ 13} The state timely appealed from the trial court's judgment, assigning two errors for our review.

> 1. The trial court erred in granting Hicks's motion to dismiss based on the defense of "outrageous government conduct."

> 2. The trial court erred in granting Hicks's motion to suppress.

## II. Law and Analysis

## A. Motion to Dismiss

{¶ 14} In the first assignment of error, the state argues that the trial court erred in granting Hicks's motion to dismiss based on the defense of outrageous government conduct. The state contends that the defense is inapplicable to this case because (1) the government "did not create, manufacture, or assist in the criminal conduct that Hicks voluntarily engaged in," and (2) the government "did not coerce, force, or induce Hicks into committing any of the crimes he was charged with." The state maintains that by erroneously applying the doctrine of outrageous government conduct, the trial court did nothing but "incentivize and sanction violence and criminality as an acceptable response to perceived improper police conduct."

{¶ 15} We review a trial court's decision to dismiss an indictment de novo, without deference to the decision reached by the lower court. *State v. Ford*, 2021-Ohio-4608, 182 N.E.3d. 1252, ¶ 11 (8th Dist.); *State v. Cash*, 8th Dist. Cuyahoga No. 95158, 2011-Ohio-938, ¶ 4.

{¶ 16} It appears that the trial court dismissed the indictment based upon Hicks's claim of outrageous government conduct. Such a claim is founded on the principle that the conduct of law enforcement officers may be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-432, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). "[A] defense to a criminal charge may be founded upon an intolerable degree of governmental participation in the criminal

enterprise." *Id.* at 424. The claim is a due process defense that is determined as a matter of law prior to trial and focuses on the government's conduct. *State v. Gaines*, 193 Ohio App.3d 260, 2011-Ohio-1475, 951 N.E.2d 814, ¶ 43 (12th Dist.), citing *State v. Grunder*, 9th Dist. Medina No. 04CA0071-M, 2005-Ohio-2145, ¶ 4, and *State v. Cunningham*, 156 Ohio App.3d 714, 2004-Ohio-1935, 808 N.E.2d 488, ¶ 14 (2d Dist.).

{¶ 17} To obtain dismissal of an indictment based upon a claim of outrageous government conduct, a defendant must "show conduct that violates due process in such a way that it is 'so grossly shocking and so outrageous as to violate the universal sense of justice.'" *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir.2011), quoting *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir.1991); *see also United States v. Nickerson*, 731 F.3d 1009, 1015 (9th Cir.2013). In satisfying this "extremely high standard," *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir.1993), "a defendant must show a nexus between the conduct and either 'securing the indictment or [ ] procuring the conviction.'" *United States v. Dominguez-Caicedo*, 40 F.4th 938, 949 (9th Cir.2022), quoting *Nickerson* at 1015. *See also United States v. Jayyousi,* 657 F.3d 1085, 1111 (11th Cir.2011) ("[The outrageous government conduct] must relate to the defendant's underlying or charged criminal acts.").

{¶ 18} "Two factors form the underpinnings for most cases where the outrageous government conduct defense has been upheld: (1) government creation of the crime, and (2) substantial coercion." *Gaines* at ¶ 44, citing *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir.1992); *Cunningham* at ¶ 27. "'[T]o constitute

outrageous conduct, revulsion to the tactics [used by the government] must be overwhelming and universal,' *Cunningham* at ¶ 29; and 'coercion of any type must be particularly egregious.' *Mosley* at 912." *Id*.

{¶ 19} Because "the law frowns on the exoneration of a defendant for reasons unrelated to his guilt or innocence," the "extraordinary defense" of outrageous government conduct "is reserved for the most appalling and egregious situations," and will be invoked only in truly exceptional circumstances. *United States v. Guzmán*, 282 F.3d 56, 59 (1st Cir. 2002). "It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating." *Mosley* at 910.

{¶ 20} By way of example, courts have recognized that constitutionally unacceptable conduct includes, among other things, situations "where law enforcement agents employed unwarranted physical or mental coercion, where government agents engineer and direct the criminal enterprise from start to finish, and where the government essentially manufactures new crimes in order to obtain the defendant's conviction." *Ramirez v. Montgomery*, C.D.Cal. No. 2:19-CV-8424-SB (LAL), 2021 U.S. Dist. LEXIS 254444 (Nov. 30, 2021), citing *United States v. Stenberg*, 803 F.2d 422, 429 (9th Cir.1986), *superseded by statute on other grounds United States v. Atkinson*, 966 F.2d 1270, 1273 (9th Cir.1992). *See also Rochin v. California*, 342 U.S. 165, 172-173, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (government conduct shocked the conscience and violated the decencies of civilized conduct where agents forcibly opened the defendant's mouth and forced a doctor to

pump his stomach); *United States v. Twigg*, 588 F.2d 373, 380-381 (3d Cir.1978) (finding outrageous government conduct because agents implanted criminal design in defendant's mind and provided essential supplies and technical expertise).

{¶ 21} Far more frequently, however, courts have found that dismissal of an indictment was not appropriate based on alleged government misconduct. *See, e.g., United States v. Williams*, 547 F.3d 1187, 1199-1201 (9th Cir.2008) (no outrageous government conduct even though the government suggested, directed, and supervised entire criminal enterprise because defendants were previously engaged in similar crimes, capable of continuing their crimes, contemplating and engaged in criminal activity, and government agent used artifice and stratagem to infiltrate criminal organization); *United States v. Nieman*, 520 F.3d 834, 837-838 (8th Cir.2008) (no outrageous government conduct despite government reliance on "unsavory informant" who used drugs with defendant because use of "unsavory informants" is routine and informant's drug use is not attributable to the government); *United States v. Luisi*, 482 F.3d 43, 59 (1st Cir.2007); *United States v. Williams*, 372 F.3d 96, 111-112 (2d Cir.2004); *United States v. Hoffecker*, 530 F.3d 137, 156 (3d Cir.2008); *United States v. Dyess*, 478 F.3d 224, 236 (4th Cir.2007); *United States v. Gutierrez*, 343 F.3d 415, 422 (5th Cir.2003); *United States v. Chastain*, 198 F.3d 1338, 1352 (11th Cir.1999); *United States v. Hinds*, 329 F.3d 184, 190 (D.C. Cir.2003).

{¶ 22} More relevant to the circumstances presented in this case, numerous defendants have attempted, and failed, to have indictments dismissed based on the

conduct of government officials during arrests. *See, e.g., United States v. Bridgewater*, 175 F.Supp.2d 141 (D.P.R. 2001) (defendant arrested in international waters where he was subjected to poor weather conditions and handcuffed in the berth of a turbulent boat was not outrageous government conduct); *United States v. Fernandez*, 500 F.Supp.2d 661 (W.D.Tex. 2006) (finding no outrageous government conduct where defendant was tricked into going to a location where agents took her into custody); *United States v. Colburn*, 546 F.Supp.3d 22 (D.Mass. 2021) (no outrageous government conduct where agents arriving at defendant's home to arrest her exacerbated a heart condition and offered to call in medical treatment, and she declined); *United States v. Edmonds*, 103 F.3d 822 (9th Cir.1996) (rejecting outrageous government conduct where defendant argued that the government relied on affidavits to execute a search warrant, even though the government suspected the affidavits had been falsified.).

{¶ 23} In this case, we cannot find the conduct of the responding officers created or otherwise related to the circumstances supporting the receiving stolen property and improperly handling a firearm in a motor vehicle charges. The circumstances supporting these charges rely on acts that preceded Hicks's encounter with the police on October 3, 2021. Similarly, the police neither created these crimes nor induced Hicks to possess a stolen vehicle or handle a loaded firearm therein.

{¶ 24} With respect to the remaining offenses of felonious assault, vandalism, and criminal damaging, we find that the only actions that can be

characterized as creating, coercing, or relating to the crimes stemming from Hicks's attempt to flee was the responding officers' decision to block the parking lot exit with patrol vehicles and Ofc. Stockhausen's attempt to open Hicks's car door by pulling on the door handle. Whether these actions violated Hicks's Fourth Amendment rights is relevant, but not determinative of a claim of outrageous government conduct. This court does not endorse such conduct absent an articulable basis to do so under the totality of the circumstances. Nevertheless, we cannot say that the officers' creation of a roadblock or Ofc. Stockhausen's attempt to open Hicks's car door amounted to unprecedented police tactics that grossly shock the universal sense of justice. These actions constitute ordinary conduct for officers investigating an active crime scene.

{¶ 25} After careful review of the record, and upon reviewing the application of the doctrine of outrageous government conduct by courts throughout this country, we are unable to conclude that this is "the most appalling and egregious situation" where the government's conduct justifies the dismissal of a defendant's indictment.

{¶ 26} This court recognizes that Ofc. Dodge's use of force resulted in substantial injuries that would have led to the loss of life in most instances. As addressed further below, we take no position as to whether Ofc. Dodge's conduct was excessive or unreasonable because the trial court did not render any findings of fact or conclusions of law on this issue for us to review. Nevertheless, as relevant to the legal question currently before this court, we find the evidence adduced at the

suppression hearing demonstrates that the actions by Hicks supporting the felonious assault, vandalism, and criminal damaging charges were fully completed at the time Ofc. Dodge determined that it was necessary to discharge his service weapon. Thus, we cannot say that Ofc. Dodge's conduct created, coerced, or related to the actions by Hicks in committing the above crimes.

{¶ 27} Moreover, this court is unaware of any case law suggesting that the alleged use of excessive force in facilitating an arrest supports the application of the outrageous government conduct defense. *Leiterman v. Rushen,* 704 F.2d 442, 444 (9th Cir.1983) (finding no causal connection between the police violence and the conviction). "Misconduct by the police may give rise to a variety of claims and remedies." *Leiterman* at *id.* While the reasonableness of Ofc. Dodge's use of deadly force may be debated in other pending or future proceedings, his conduct did not effectuate or induce Hicks's voluntary actions following the initial encounter with Ofc. Stockhausen. Dismissal of Hicks's indictment pursuant to outrageous government conduct is not warranted based on the facts in the record before us.

{¶ 28} Based on the foregoing, we find the outrageous government conduct doctrine does not provide Hicks with a defense to prosecution. Accordingly, the trial court's judgment dismissing the indictment against Hicks is reversed, and this case is remanded to the trial court for further proceedings consistent with this opinion.

{¶ 29} The first assignment of error is sustained.

## B. Motion to Suppress

{¶ 30} In the second assignment of error, the state argues the trial court erred in granting Hicks's motion to suppress. The state contends that (1) the trial court erred as a matter of law by analyzing the facts using the probable cause standard, and (2) Ofc. Stockhausen "had reasonable suspicion to believe the vehicle attempting to leave the parking lot may have either been a witness or involved in the crime." Alternatively, the state suggests that if the stop was not justified, "the exclusionary rule will not work to exclude evidence of Hicks'[s] intervening criminal conduct that occurred during and/or after the initial stop."

{¶ 31} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. The trial court assumes the role of the trier of fact when presented with a motion to suppress. *Id.* Therefore, the trial court is in the best position to analyze the evidence and evaluate the credibility of the witnesses. *Id.* Accordingly, an appellate court must defer to the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* However, an appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the facts meet the applicable legal standard. *State v. Hill*, 8th Dist. Cuyahoga Nos. 83762 and 83775, 2005-Ohio-3155, ¶ 12.

{¶ 32} The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

{¶ 33} Article I, Section 14 of the Ohio Constitution contains nearly identical language and provides the same protections as the Fourth Amendment to the United States Constitution. *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234, 238-239, 685 N.E.2d 762 (1997).

{¶ 34} "The 'basic purpose of [the Fourth] Amendment' * * * 'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter v. United States*, ___U.S.___, 138 S.Ct. 2206, 2213, 201 L.Ed.2d 507 (2018), quoting *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Searches and seizures conducted outside of the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Therefore, evidence obtained from a search or seizure deemed unreasonable must be suppressed. *Mapp v. Ohio*, 367 U.S. 643, 651, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

{¶ 35} "Interactions between police and individuals can fall into three distinct categories: 1) a consensual encounter, 2) an investigative detention, or 3) an arrest." *State v. Parrish*, 8th Dist. Cuyahoga No. 111990, 2023-Ohio-3356, ¶ 14, citing *State v. Thomas*, 2d Dist. Montgomery No. 23979, 2011-Ohio-1292, ¶ 9.

{¶ 36} The first category of police-citizen contact is a consensual encounter. The Supreme Court created this category in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). In a consensual encounter, police practices such as approaching a person in a public place, engaging the person in conversation, requesting information, examining one's identification, and requesting to search a person's belongings are permissible, and Fourth Amendment guarantees are not implicated in such encounters. *State v. Jackson*, 8th Dist. Cuyahoga No. 110462, 2022-Ohio-187, ¶ 32. This category of encounters, like other categories, are judged according to the totality of the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). These encounters remain consensual as long as the police officer, by physical force or show of authority, has not restrained the person's liberty such that a reasonable person would not feel free to walk away. *Mendenhall* at 554.

{¶ 37} In *Mendenhall*, the United States Supreme Court listed several factors that indicate when an encounter is no longer consensual and, correspondingly, when Fourth Amendment guarantees are implicated. These factors include "the threatening presence of several officers, the officers' wearing of a uniform, the display of a weapon, the physical touching of the person, the use of language or tone of voice indicating that compliance with the officers' requests are compelled, and the contact occurring in a nonpublic place." *Jackson* at ¶ 33, citing *Mendenhall* at *id*.

{¶ 38} The second category of a police-citizen encounter is the investigatory stop described in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),

known as a "*Terry* stop." The *Terry* stop is more intrusive than the consensual encounter, but less intrusive than a formal custodial arrest. *State v. Scott*, 8th Dist. Cuyahoga No. 74352, 1999 Ohio App. LEXIS 3598, 8 (Aug. 5, 1999). "The Fourth Amendment permits brief investigative stops * * * when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014), quoting *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

{¶ 39} In *Terry*, the United States Supreme Court "implicitly acknowledged the authority of the police to make a forcible stop of a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." (Emphasis deleted.) *United States v. Place*, 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). "Limited in both duration and purpose, the *Terry* stop may last only as long as it reasonably takes a police officer to confirm or dispel suspicion of criminal activity." *State v. Hall,* 2016-Ohio-783, 60 N.E.3d 675, ¶ 17 (1st Dist.), citing *Terry* at 30.

{¶ 40} Precisely defining "reasonable suspicion" is not possible, and as such, the reasonable-suspicion standard is "'not readily, or even usefully, reduced to a neat set of legal rules.'" *Ornelas v. United States*, 517 U.S. 690, 695-696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), quoting *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Reasonable suspicion justifying "a *Terry* stop requires something more than an 'inchoate and unparticularized suspicion or 'hunch.'""

*Cleveland v. Maxwell*, 8th Dist. Cuyahoga No. 104964, 2017-Ohio-4442, ¶ 19, quoting *Terry* at 27. And, the propriety of a *Terry* stop "must be viewed in light of the totality of the circumstances 'as viewed through the eyes of the reasonable and prudent police officer on the scene who must react to the events as they unfold.'" *Maxwell* at *id.*, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "'might well elude an untrained person.'"" *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 21, quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), quoting *Cortez* at 418.

{¶ 41} The Ohio Supreme Court has identified certain specific and articulable facts that justify a *Terry* stop by way of reasonable suspicion that fall into four general categories: (1) location; (2) the officer's experience, training, or knowledge; (3) the suspect's conduct or appearance; and (4) the surrounding circumstances. *State v. Bobo*, 37 Ohio St.3d 177, 178-179, 524 N.E.2d 489 (1988); *Andrews* at 87-88. No single factor is dispositive; the decision must be viewed based on the totality of the circumstances. *Bobo* at paragraph one of the syllabus. Relevant to the circumstances of this case, the Ohio Supreme Court has further explained as follows:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. * * * A brief stop

of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. * * * (Citations omitted.) *Adams v. Williams* (1972), 407 U.S. 143, 145-146.

*Bobo* at 180.

{¶ 42} The third type of police-citizen encounter is equivalent to an arrest. An individual is arrested when (1) there was an intent to arrest; (2) under real or pretended authority; (3) accompanied by an actual or constructive seizure or detention; and (4) that is so understood by the person arrested. *State v. Darrah*, 64 Ohio St.2d 22, 26, 412 N.E.2d 1328 (1980). A constitutionally valid arrest is one that is supported by the probable cause standard. *State v. Tibbetts*, 92 Ohio St.3d 146, 153, 749 N.E.2d 226 (2001).

{¶ 43} Whether probable cause exists depends upon the reasonable conclusions to be drawn from the facts known to the arresting officer at the time of the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). Probable cause exists where the totality of the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the defendant had committed or was committing an offense. *Id.*, citing *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Thus, "[a] police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir.2000); *see also Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir.2015), quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

{¶ 44} Applying the foregoing to the circumstances of this case, we find Ofc. Stockhausen's initial interaction with Hicks amounted to a consensual encounter. Upon arriving at the scene, Ofc. Stockhausen observed Hicks in the parking lot of the apartment complex where gunshots were reported just minutes before the police arrived. Ofc. Stockhausen testified that he signaled for Hicks to stop his vehicle in an effort to gather information and determine whether Hicks may have been involved or witnessed the shooting. With that stated, however, we find the consensual nature of the encounter ended once Ofc. Stockhausen ordered Hicks to turn off the engine of his car and attempted to open Hicks's driver's side door after Hicks stated that he was not involved in the incident being investigated. *See Mentor v. Walker*, 11th Dist. Lake No. 12-243, 1988 Ohio App. LEXIS 5226, 5 (Dec. 30, 1988.) ("The moment the officer took hold of the door handle, and opened the car door, the occupants were no longer free to go."); *State v. Barth*, 11th Dist. Lake No. 99-L-058, 2000 Ohio App. LEXIS 2351, 2 (June 2, 2000). It is clear from Ofc. Stockhausen's conduct and show of authority that Hicks was not free to leave or terminate the encounter. At this point, the interaction evolved into a *Terry* stop.

{¶ 45} In reaching this conclusion, we note that the evidence adduced at the suppression hearing does not establish that a reasonable person in Hicks's position would have understood the situation to constitute "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *State v. Duhamel*, 8th Dist. Cuyahoga No. 102346, 2015-Ohio-3145, ¶ 22, citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). Nevertheless,

although Hicks was not arrested, he was seized within the meaning of the Fourth Amendment. Accordingly, the relevant inquiry before the court was whether the *Terry* stop was warranted under the totality of the circumstances.

{¶ 46} When evidence is gathered in a search and seizure that violates the Fourth Amendment, the exclusionary rule generally prevents its use in a criminal trial brought against the victim of the unlawful search. *See Illinois v. Krull*, 480 U.S. 340, 347, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). The "exclusionary rule is a judicially created sanction designed to protect Fourth Amendment rights through its deterrent effect." *State v. Brown*, 142 Ohio St.3d 92, 2015-Ohio-486, 28 N.E.3d 81, ¶ 12. If the seizure was unlawful, any evidence obtained after the unlawful seizure must be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

{¶ 47} However, the exclusionary rule does not operate to exclude evidence of "independent and distinct criminal conduct." *State v. Freeman*, 2d Dist. Montgomery No. 18798, 2002 Ohio App. LEXIS 688, 9 (Feb. 15, 2002). Rather, the "[a]pplication of the exclusionary rule is generally restricted to those areas where its remedial objectives are most efficaciously served." *Id.*, citing *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Thus, Ohio courts have held that "evidence of a fresh crime committed during or after an unlawful search and seizure is not properly regarded as deriving from the unlawful search and seizure; that evidence instead derives from the defendant's intervening voluntary criminal act." *State v. Hammer*, 2d Dist. Darke No. 2012-CA-2, 2012-Ohio-3497, ¶ 19, citing

*State v. Ali*, 154 Ohio App.3d 493, 2003-Ohio-5150, 797 N.E.2d 1019, ¶ 18 (7th Dist.); *State v. Cammon*, 8th Dist. Cuyahoga No. 91574, 2009-Ohio-4706, ¶ 27-28; and *Freeman*.

{¶ 48} As stated, the trial court in this case granted Hicks's motion to suppress finding that the initial stop of Hicks's vehicle was a seizure, "*lacking probable cause.*" (Emphasis added.) As the United States Supreme Court has explained,

> [r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). *See also State v. Bly*, 10th Dist. Franklin No. 13AP-909, 2014-Ohio-1261, ¶ 15 (reasonable suspicion is less than the level of suspicion required for probable cause); *State v. Iloba*, 9th Dist. Wayne No. 20AP0030, 2021-Ohio-3700, ¶ 17 ("Although both reasonable suspicion and probable cause are evaluated based on the totality of the circumstances, the concepts are not interchangeable."), citing *State v. R.L.*, 9th Dist. Summit No. 29573, 2020-Ohio-2811, ¶ 15. Thus, "probable cause is a stricter standard than reasonable and articulable suspicion * * * [and] [t]he former subsumes the latter." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 23, citing *State v. Evans*, 67 Ohio St.3d 405, 411, 618 N.E.2d 162

(1993). *See also Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, at ¶ 20.

{¶ 49} Because the legal question before the trial court was only whether the police had *reasonable suspicion* to perform a *Terry* stop, we agree with the state's assertion that the trial court erred as a matter of law to the extent it considered the more demanding standard of whether the police had *probable cause* to stop Hicks's vehicle. The application of the incorrect standard prevented the trial court from engaging in the proper legal analysis. Accordingly, we must remand the matter for the trial court to determine, based on the evidence presented at the suppression hearing, whether police had reasonable suspicion to stop Hicks. *See State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761, 141 N.E.3d 169, ¶ 19, citing *In re Adoption of P.L.H.*, 151 Ohio St.3d 554, 2017-Ohio-5824, 91 N.E.3d 698, ¶ 33 (noting that when a lower court applies the improper legal standard, the proper remedy is to remand for consideration of the evidence under the correct legal standard). *See also State v. Brown*, 10th Dist. Franklin No. 17AP-351, 2018-Ohio-1476, ¶ 24, citing *State v. Byrd*, 10th Dist. Franklin No. 15AP-1091, 2016-Ohio-7670, ¶ 27, and *State v. Muldrow*, 10th Dist. Franklin No. 15AP-1119, 2016-Ohio-4774, ¶ 26 (where trial court applies wrong legal standard in a motion to suppress, the appropriate remedy is to remand for the trial court to apply the correct legal standard with appropriate factual findings).

{¶ 50} The second assignment of error is sustained.

## III. Conclusion

{¶ 51} The trial court abused its discretion in dismissing the indictment based on "outrageous government conduct," a defense that has seldom been found to have merit and does not appear to apply to the facts giving rise to Hicks's indictment. The trial court further erred in failing to apply the correct legal standard to the motion to suppress.

{¶ 52} Based on the foregoing, the judgment of the trial court is reversed, and this matter is remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, PRESIDING JUDGE

EMANUELLA D. GROVES, J., CONCURS;
SEAN C. GALLAGHER, J., CONCURS (WITH SEPARATE OPINION)


SEAN C. GALLAGHER, J., CONCURRING:

{¶ 53} The polarized nature of American society means individuals perceive events differently. Facts and circumstances are weighed differently depending on the perspective of the individual.

{¶ 54} No scenario paints these divergent perspectives more clearly than a police shooting. That reality forms the backdrop of this case.

{¶ 55} I concur fully with the judgment and analysis of the majority, but I write separately to offer a view that more creative options for law enforcement must be explored by those in authority to attempt to move the narrative away from the polarized extremes we see today.

{¶ 56} In this case, the officer shot Hicks because he believed that was the only way he could diffuse a rapidly escalating situation that would result in more harm. Whether that was the appropriate decision will be the subject of ongoing debate.

{¶ 57} We know almost nothing of the facts in play that caused Hicks to behave the way he did. There is no evidence he was involved in the reported shooting that initially brought police to the scene. We have no evidence he was under the influence of drugs or alcohol. The only reference in the briefs is an assertion by counsel that Hicks thought the police were going to kill him. Whatever the rationale, Hicks's conduct certainly did not diffuse the situation.

{¶ 58} What we do know is that in such rapidly escalating scenarios as we see in this case, police officers often feel they are compelled to "go to the gun" as a perceived last resort. This often happens in a matter of seconds from the start to the end of an encounter. There are few options for officers to diffuse such situations.

{¶ 59} As one who has served as a judge for over a quarter of a century, with over forty years of direct experience in the criminal justice system, I have often

wondered if we are doing enough as a society to create or increase options for officers.

{¶ 60} And this brings me to my point. Why isn't electronic vehicle immobilization an option?

{¶ 61} Black boxes, or event data recorders (EDRs), have been in some of the major American car brands since 1994. The National Highway Traffic Safety Administration has been using them to collect car accident data since early in the 2000s.

{¶ 62} The federal government does not require an EDR for every vehicle, but federal regulations require that, if equipped with an EDR, the device must gather the following black box information: (1) vehicle speed; (2) accelerator or throttle position; (3) frontal, side, and curtain airbag deployment; (4) application of the brakes; (5) number of crash events; and (6) steering input. 49 C.F.R. 563.7. Additionally, these devices must also gather data about (a) the seat belt status of the driver and front passenger; (b) engagement of the ABS; and (c) the vehicle roll angle. *See* Steven M. Gursten, *Black Boxes in Cars: What You Need to Know*, available at https://www.michiganautolaw.com/blog/2023/03/13/black-boxes-in-cars/ (last visited Nov. 13, 2023).

{¶ 63} The federal safety regulations for "Event Data Recorders" apply to vehicles "manufactured on or after September 1, 2012" if the vehicles "are equipped with an event data recorder." 49 C.F.R. 563.3.

{¶ 64} If there was a will to act by federal legislators, a shut off code could be placed inside black boxes that could immobilize the vehicle in situations as we see in this case. Such a code could be activated by an officer from a button or device on the officer's service belt. The officer would have to have a reasonable articulable suspicion or probable cause to activate an immobilization, but in doing so many dangerous high-speed chases would be avoided. While not all vehicles would have such an immobilization capability at the outset, we have to start somewhere.

{¶ 65} Seat belts have been mandatory equipment since the 1968 model year in the United States. Obviously, it took time for all cars on the road to eventually have them, but we did get to that point over time.

{¶ 66} If we truly desire to see an end to scenarios like the one that played out in this case then perhaps we should look at all possibilities that increase options for officers short of using their weapon.